EVA CHARTIER, administratrix, vs. BARRE WOOL COMBING COMPANY, LIMITED.

SAME vs. GARDNER ELECTRIC LIGHT COMPANY.

Worcester.  October 2, 1917. — January 5, 1918.

Present: RUGG, C. J., BRALEY, DE COURCY, & PIERCE, JJ.

*Negligence*, Contributory. *Electricity*. *Evidence*, Matters of common knowledge.

It has become a matter of common knowledge that physical harm is likely to follow contact with a wire charged with an electric current and also that copper wires are used for the transmission of such a current.

Where before the enactment of St. 1914, c. 553, a painter, whose employer had agreed to paint a large iron smoke stack on the top of a power house, twice already had ascended a ladder placed against the stack, the foot of which, instead of being put on the roof of the power house where it might have been put perfectly well, had been placed on the small adjoining roof of a substation of an electric light company, which was surrounded by a parapet wall from eight to twelve inches high enclosing a space substantially occupied by copper wires uninsulated and carrying a high voltage of electricity, plainly open to view and sizzling and hissing, and where this painter, on returning from partaking of refreshments at a neighboring hotel, went on the roof of the electric light sub-station without rubbers or gloves and placed one hand on the ladder ready to ascend it for the third time, and received a shock of electricity that resulted in his death, it was *held*, that as matter of law he was not in the exercise of due care at the time of his injury, and that neither the proprietor of the power house and stack nor the electric light company maintaining the wires was liable for causing his injury or death.

TWO ACTIONS OF TORT by the administratrix of the estate of Augustine Chartier, late of Ware, the first against the Barre Wool Combing Company, Limited, a corporation having its principal place of business at Barre, and the second against the Gardner Electric Light Company, a corporation, for causing the conscious suffering and death of the plaintiff's intestate by a shock from an electric wire carrying sixty-six thousand volts of electricity received by him on March 11, 1914, and resulting in his death on March 16, 1914.  Writs dated March 3, 1915.

In the Superior Court the cases were tried together before *Sanderson*, J.  The evidence relating to the question whether the plaintiff's intestate was in the exercise of due care is described in the

opinion.  At the close of the evidence, the defendants among other requests, asked the judge to rule that there was no evidence that the plaintiff's intestate was in the exercise of due care and that the plaintiff could not recover.  The judge refused to make this and other rulings requested by the defendants and submitted the cases to the jury.

The jury returned a verdict for the plaintiff in each of the cases in the sum of $1,500 for conscious suffering and in the sum of $2,500 for causing death, the verdict being the same against each of the defendants.  After the return of the verdicts but before their recording the presiding judge under St. 1915, c. 185, reserved leave, with the assent of the jury, to enter a verdict in each case for the defendant if upon the exceptions taken or the questions of law reserved it should be decided that such verdicts for the defendants should have been entered.  Each of the defendants alleged exceptions.

*F. F. Dresser,* (*G. P. Hughes* with him,) for the defendant in the first case.

*C. C. Milton,* (*F. L. Riley* with him,) for the defendant in the second case.

*E. H. Vaughan & G. D. Storrs,* for the plaintiff, submitted a brief.

PIERCE, J.  At the time of the accident the intestate was in the employ of one Gauette as a painter.  Gauette had entered into an agreement with the defendant in the first case, the Barre Wool Combing Company, Limited, to paint an iron smoke stack for a lump sum of money.  He was to furnish men, all rigging, stock and material, — everything to go right on with the job except ladders, which that defendant had and agreed to lend.

The iron stack was about one hundred and four feet high and five feet in diameter, with a permanent iron ladder running from the top to a point thirty-four feet and six inches above the roof of a power house containing a steam turbine and boiler.  The roof of this building was eighty-two feet by fifty-two feet and was clear and unobstructed.  The stack stood separate and some feet distant from the side of the power house.

Adjoining the power house and two feet and four inches distant from the iron stack was a small building, which stood on land of the Barre Wool Combing Company, Limited, but was built,

owned, and controlled by the defendant in the second case, the Gardner Electric Light Company. This building was used by the last named defendant as a transformer station to furnish high voltage electric current delivered there by the Connecticut River Transmission Company from generating stations on the Connecticut and Deerfield rivers. The roof of the transforming station was higher than the roof of the power house. The coping of the substation at its northeast corner where it joined the power house was fifteen inches and the coping at its northwest corner where it adjoined the power house was three feet and two inches above the roof of the power house. The roof of the substation was a few inches below the coping at its east side and a foot and one half at its west side. It was twenty-seven and a half feet measured east and west and thirteen feet in width, and was entirely surrounded and enclosed by a parapet wall of brick with a small stone coping eight to twelve inches wide. Upon the roof of the substation and within the enclosure were nine standards about four feet in height above the roof occupying with the wires substantially all the space within the parapet. The base of them was concrete that went up perhaps half the height, and above were posts and bell shaped pieces — insulators — to which choke coils and power wires carrying a voltage of sixty-six thousand volts were attached. The posts of those nearest the smoke stack were about five feet from the edge of the substation roof, and the base of the concrete was about three and one half feet from the edge of the substation roof. The power wires were open to view, were not insulated and were "sizzling" before and at the time of the accident.

On the morning of the accident Gauette, the plaintiff's intestate and the other workman went with their tackle to the premises. Gauette selected of the ample supply of ladders such as he chose. He and his men put a thirty-foot extension ladder against the power house, went up from the ground to the roof, pulled it on top of the roof and then raised it against the stack. It did not reach to the foot of the iron ladder attached to the stack; then it was pulled down and they went to the substation building, stepped up on the coping, then on or over the wall or parapet and again placed the thirty-foot ladder against the stack. It was not long enough. "We lifted the thirty-foot ladder down from the

stack and down from the boiler roof on to the ground and we raised this thirty-five foot ladder we brought." There were other and longer ladders available, but no attempt was made to use or raise them from the power house. The ladder when placed rested on the substation roof, one leg a few inches distant and the other a little farther from one of the concrete posts to which the high voltage wires ran.

The intestate went up the ladder to the bottom of the iron ladder, lashed the wooden ladder to the iron ladder and then came down. He again climbed the ladder this time to the top, where he fastened his block. On coming down he appeared nervous and the three men went over to the hotel where the intestate partook of refreshments. On their return they went on the roof, the intestate without rubbers or gloves. He placed one hand on the ladder ready to go up and received an electric shock as he did so.

The accident happened before St. 1914, c. 553, and consequently the burden is on the plaintiff to prove at least the due care of the intestate. The photographs submitted at the hearing make it plain that the intestate knew or should have known the peril to life that hedged about his entrance to the roof of the substation. The copper wires were exposed to view, they were not insulated — they were unprotected; the roof space occupied was narrow and not devoted to other uses, and it was set apart and enclosed from neighboring property by a sizable parapet. It has become common knowledge that physical harm is likely to follow any contact with an electrical current, and it is equally well known that copper wires are used as the medium of the transmission of such a current. The sizzling and hissing of the wires were unmistakable and presented a warning of danger near at hand to be disregarded at one's peril. No exigency of time or of space called for the use of the substation roof as a place to rest the ladder. The roof of the power house was large and free of obstruction and there was an abundance of ladders ready for use. Knowing all the above facts, as the intestate must have done, neither he nor any one on his behalf took any precaution whatever for his safety. *French* v. *Sabin,* 202 Mass. 240, 242.

The sizzling wires, the restricted space within which they were confined, the obvious likelihood of harm to a person who should come near them, and the fact that the business of the intes-

tate did not necessitate going upon the dangerous roof distinguish the case at bar from *Griffin* v. *United Electric Light Co.* 164 Mass. 492, *McCrea* v. *Beverly Gas & Electric Co.* 216 Mass. 495, and *Prince* v. *Lowell Electric Light Corp.* 201 Mass. 276.

The motion to direct a verdict for each defendant should have been granted. It follows that there is no occasion to consider whether the plaintiff was upon the premises by the express or implied invitation of either defendant.

And it also follows that judgment in each case must be entered for the defendant. St. 1909, c. 236.

*So ordered.*